FAEGRE DRINKER BIDDLE & REATH LLP
Ross A. Lewin
P. Leigh Bausinger
Antoinette M. Snodgrass
105 College Road East, P.O. Box 627
Princeton, New Jersey 08542
Telephone: (609) 716-6500

*Attorneys for Plaintiff*
*BFI Waste Systems of New Jersey, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BFI WASTE SYSTEMS OF NEW JERSEY, INC.<br><br>Plaintiff,<br><br>v.<br><br>TOWNSHIP OF MONROE, MIDDLESEX COUNTY, NEW JERSEY,<br><br>Defendant. | CIVIL ACTION NO.:<br><br><br>**CIVIL ACTION COMPLAINT**<br>**AND JURY DEMAND** |

Plaintiff BFI Waste Systems of New Jersey, Inc., by and through its counsel, Faegre Drinker Biddle & Reath LLP, hereby alleges as follows:

**INTRODUCTION**

1.      This matter concerns a closed municipal landfill and Superfund site known as the Monroe Township Landfill (the "Landfill") which is owned by Defendant Monroe Township ("Monroe") and was operated by Monroe for the majority of its active life.

2.      Plaintiff BFI Waste Systems of New Jersey, Inc. ("BFI"), which had also been an operator of the Landfill, has spent tens of millions of dollars over a span of more than 40 years to

1

close, remediate and maintain the Landfill in an environmentally compliant manner.

3.     Since the cessation of active landfilling in 1978, Monroe and BFI have repeatedly disputed which party bears responsibility for closure and post-closure activities at the Landfill. Nevertheless, BFI has consistently addressed environmental concerns at the Landfill for over four decades.  It implemented a series of environmental measures necessary to close the Landfill at a cost of over $10 million and has performed post-closure maintenance of the Landfill at a cost of more than $20 million.

4.     Monroe, rather than accepting its good fortune in having a responsible entity maintain and pay for a Superfund site for which it is jointly and severally liable, has instead taken actions to thwart BFI's operations and maintenance of the Landfill.  Starting in September 2020, Monroe intentionally disrupted BFI's long-term and environmentally-sound management of the Landfill and breached agreements that have been in place for decades, thereby dramatically increasing cost and environmental risk.  Although BFI and Monroe had entered into an agreement authorizing BFI to use the municipal sewers for the disposal of leachate generated at the Landfill "indefinitely," and although this method of disposal has been approved by the United States Environmental Protection Agency ("USEPA") and the New Jersey Department of Environmental Protection ("NJDEP"), Monroe blocked BFI's access to the municipal sewers in September 2020 after receiving odor complaints from nearby residents.

5.     Monroe acted without attempting to understand how use of the sewers to transmit leachate could suddenly cause odor problems thirty-seven years after leachate was first introduced into the sewers.  Indeed, residents continue to make odor complaints today, more than two years after leachate discharges to the sewers ceased, indicating a cause other than the leachate.

6.     As a result of Monroe's action, an alternate method of leachate disposal needed to

be developed on an emergency basis.  BFI did that at considerable cost and without any assistance from Monroe.  The sudden requirement to manage leachate in an alternative manner required construction of extensive new infrastructure and the implementation of a large-scale tanker truck transportation and offsite leachate disposal operation.  Monroe's unwarranted and unreasonable refusal to allow leachate discharges to the sewer system has dramatically increased costs of disposal.  Operations and maintenance costs at the Landfill have spiraled from an average of several hundred thousand dollars per year to over $9 million in 2021 alone.  The total cost of the necessary activities to close and maintain the Landfill borne by BFI now exceeds $30 million and continues to accrue.

7.      This emergency alternative was intended as an interim, short-term plan. Accordingly, BFI proceeded to study the sewer issue in coordination with NJDEP and ultimately submitted a Leachate Reintroduction Plan to NJDEP in 2021 outlining carefully-designed protocols for the reintroduction of leachate into the sewers.  NJDEP approved the Plan and authorized its implementation.  Although NJDEP, the governmental agency charged with protecting the environment and safeguarding public health, had approved the Plan, Monroe blocked its implementation, refusing to give BFI needed access to its sewer system.  Instead of allowing reintroduction of leachate into the local sewers as approved by NJDEP, Monroe is undertaking the construction of an 8,500-foot-long force main for leachate (the "Force Main") at a cost of approximately $5 million.  Monroe plans to impose those costs on BFI.

8.      BFI now brings this action under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"), the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, et seq. ("Spill Act"), the Sanitary Landfill Facility Closure and Contingency Fund Act, N.J.S.A. 13:1E-100 et seq. (the "Landfill Closure Act"), and its

contracts with Monroe to require Monroe to share in all of BFI's past and future costs, to fully participate and cooperate as a liable party in the ongoing activities at the Landfill, to pay damages resulting from its contract breaches, to fulfill its contractual commitments to BFI in the future and to prevent Monroe from passing on the cost of its unnecessary Force Main project to BFI.

## PARTIES

9.      Plaintiff BFI Waste Systems of New Jersey, Inc., successor by way of merger to Browning-Ferris Industries of South Jersey, Inc., and Princeton Disposal Services, Inc. (collectively, "BFI" or "Plaintiff") is a New Jersey corporation with an address of 18500 North Allied Way, Phoenix, Arizona 85054.

10.     Defendant Township of Monroe, Middlesex County, New Jersey ("Monroe") is a New Jersey municipality with an address of Municipal Complex, 1 Municipal Plaza, Monroe Township, NJ 08831.  Monroe is the successor to the rights and obligations of the Monroe Township Municipal Utilities Authority ("MTMUA").

## JURISDICTION AND VENUE

11.     This Court has original and exclusive jurisdiction over this action under Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), because it involves questions arising under federal law.  In addition, the Declaratory Judgments Act, 28 U.S.C. § 2201, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to grant Plaintiff declaratory relief.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims for relief pursuant to 28 U.S.C. § 1367(a) because those claims arise out of the same common nucleus of operative facts as Plaintiff's federal law claims.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and pursuant to § 113(b)

of CERCLA, 42 U.S.C. § 9613(b), because BFI and Monroe are residents of the District of New Jersey, because a substantial part of the events giving rise to these claims occurred in this judicial district, because the property that is the subject of this action is located in the District of New Jersey, and because USEPA's designation of the Landfill on the National Priorities List related to its conclusion that releases of hazardous substances into the environment took place at such property and injured and affected such property.

## **BACKGROUND**

### A.   **History and Operation of the Monroe Township Landfill**

14.     The Landfill is an approximately 86-acre property that was established by Monroe as a disposal site on Monroe-owned land in the mid-1950s and remained an active disposal site until 1978.

15.     Monroe has been the owner of the Landfill at all relevant times up to and including the present day.

16.     Monroe directly operated the Landfill from the mid-1950s until 1968.

17.     Beginning in 1968, Monroe indirectly operated the Landfill by contracting out its operation to Princeton Disposal Services, Inc., a predecessor to BFI.

18.     On June 7, 1978, the Township Council of Monroe passed a resolution stating its intention not to renew the contract with BFI for operation of the Landfill and to close the Landfill.

19.     Around that time, NJDEP ordered that the Landfill be closed consistent with its rules and regulations and the Landfill's solid waste permit.

### B.   **BFI's Implementation of the Landfill's Closure**

20.     After the cessation of active landfilling in 1978, environmental conditions at the Landfill deteriorated when leachate began to seep into a surrounding neighborhood.  Leachate

forms when rainwater filters through a landfill and leaches out constituents from the buried waste.

21.     The need for Landfill closure and the existence of leachate seeps led to litigation in the New Jersey courts initiated by NJDEP and involving both BFI and Monroe.

22.     As a result of court orders and a consent order entered in the litigation, BFI undertook substantial measures to close the Landfill in an environmentally-responsible manner and to ameliorate the immediate impacts to the environment.  BFI's efforts were performed under the supervision and to the satisfaction of NJDEP.

23.     By May 1980, BFI had successfully halted the discharge of leachate into the surrounding neighborhood.

24.     By May 1981, BFI had constructed a clay cut-off wall (a subsurface barrier located at the lowest downgradient section of the Landfill to contain the flow of leachate) and a leachate collection system along the northeast border of the Landfill, had performed grading and landscaping of the Landfill and had placed an initial leachate collection system into operation.

25.     By January 1, 1983, BFI completed construction of the clay cut-off wall and leachate collection system for the entire Landfill, performed final capping, installed drainage control structures and seeded the site.

26.     BFI expended millions of dollars in performing the aforementioned activities.

27.     In September 1983, the Landfill was added to the National Priorities List established under CERCLA and was designated as a Superfund Site.  NJDEP was designated as the lead agency for the Landfill under CERCLA.

28.     Pursuant to a subsequent consent order entered into with NJDEP effective December 29, 1986, BFI undertook further measures between 1987 and 1991 to close the Landfill in an environmentally-responsible manner and to alleviate threatened impacts to the environment.

These measures included upgrading the soil erosion and sediment control systems and the sedimentation basin at the Landfill, closing a leachate storage lagoon and constructing an underground leachate storage tank, installing landfill gas vents, installing an emergency power generator for the leachate collection system and installing chain-link fencing surrounding the Landfill to prevent unauthorized access.

29.    Following a series of environmental investigations performed by BFI that together constituted the Remedial Investigation for purposes of CERCLA, BFI prepared a Baseline Risk Assessment Report, dated July 1992.  The Baseline Risk Assessment Report employed the results of the Remedial Investigation to examine site-specific risks to potentially exposed populations including off-site residents, site trespassers, site workers and future recreational site users as well as ecological risks and potential impacts to flora and fauna, on wetland communities and on potential threatened and endangered species in the vicinity of the Landfill.   The Remedial Investigation and the Baseline Risk Assessment Report formed the basis for NJDEP's selection of a remedy for the Landfill under CERCLA.

30.    After considerable study and opportunities for public comment, NJDEP entered a Record of Decision ("ROD") in April 1993 which "set[] forth the selected final remedy for the Monroe Township Landfill Site."  The remedial action for the Landfill selected by NJDEP in the ROD and concurred in by USEPA constituted No Further Action with Maintenance and Monitoring.  NJDEP chose the selected remedy in accordance with the requirements of CERCLA.

31.    The major components of the remedial action selected by the ROD included: (1) maintenance of existing source control measures (landfill cover systems, the leachate collection and management system, emergency power supply, the landfill gas vent system, surface water drainage systems, sediment and erosion controls and security fencing); (2) implementation of a

ground water monitoring program to include installation of a sentinel well network to detect potential migration of contaminants from the Landfill; and (3) a gas emission monitoring program for the Landfill including the installation and monitoring of approximately eleven new passive gas vents.

32.     The monitoring and maintenance requirements established in the ROD were to be the subject of an operations and maintenance plan to be prepared after the entry of the ROD.

33.     The ROD also specified that NJDEP and USEPA would conduct a review within five years after the entry of the ROD to ensure that the selected remedy continued to provide adequate protection of human health and the environment.

34.     Based on the ROD, the Landfill was deleted in February 1994 from the National Priorities List established pursuant to CERCLA.

**C.     BFI Resolves USEPA's Oversight Cost Claim Through an Administrative Order on Consent.**

35.     Although NJDEP was the lead agency for the Landfill under CERCLA, USEPA participated in the development of the ROD and concurred in its entry.

36.     To resolve USEPA's claim for oversight costs, BFI consented to the entry of an Administrative Order on Consent, which was entered by USEPA on September 30, 1996 (the "AOC").

37.     Pursuant to the AOC, BFI was required to make a payment to USEPA of $100,000.00.

38.     BFI complied with the aforementioned payment obligation without any contribution from Monroe.

**D.     Implementation of the ROD**

39.     As required by the ROD, BFI prepared and gained approval for a Post-Closure

Monitoring and Maintenance Plan in 1993, which was later revised in 1997 (the "Post-Closure Plan").

40.     BFI and Monroe executed a Lawn and Fence Maintenance Agreement, dated February 23, 1998 (the "LFMA"), which allocated their respective responsibilities for the Post-Closure Plan.

41.     In the LFMA, Monroe agreed that BFI had expended well over $10 million to complete the closure of the Landfill and had, as of that time, incurred over $2 million more in post-closure monitoring and maintenance costs.

42.     Pursuant to the terms of the LFMA, Monroe agreed to pay BFI for "Lawn and Fence Maintenance" at the Landfill.

43.     As used in the LFMA, "Lawn and Fence Maintenance" means the "inspection, maintenance and associated activities at the Landfill required by the 'Post-Closure Monitoring and Maintenance Plan, Monroe Township Landfill, Monroe Township, New Jersey,' dated September 1993 (the 'Post-Closure Plan'), and as generally described in Sections 3.4, 3.7, 4.4 and 4.7 of the Post-Closure Plan, as well as the periodic mowing, regrading, reseeding and stabilizing of the undeveloped lots which act as a buffer between the Landfill and Lori Street, known as Block 148, Lots 23, 24, 25, 26 and 27 on the tax map of the Township of Monroe."

44.     Sections 3.4, 3.7, 4.4 and 4.7 of the Post-Closure Plan which are referenced in the definition of "Lawn and Fence Maintenance" detail the requirements for inspection and maintenance of the protective cover systems and site security systems at the Landfill.

45.     Under the LFMA, BFI is obligated to arrange for Lawn and Fence Maintenance and to submit invoices for those costs to Monroe, which are to be paid within 30 days of receipt.

46.     The LFMA also establishes procedures for Monroe's budgeting of Lawn and Fence

Maintenance costs.  As detailed in Paragraph 3 of the LFMA, BFI is to submit to the Township Business Administrator by November 30 of each year an estimate of the cost of Lawn and Fence Maintenance to be undertaken in the upcoming year.  The LFMA requires Monroe to include the estimated costs in its municipal budget for the following year.

47.     The LFMA also provides that if the actual costs of Lawn and Fence Maintenance differ from the budgeted amount, Monroe shall pay the actual invoiced amount.  However, if the invoiced amounts are more than the budgeted amount, Monroe may opt to pay the budgeted amount, add the overage to the following year's budget, and pay the overage on January 1 of the subsequent year.

48.     Although Monroe and BFI had asserted claims against each other over their respective responsibility for the Landfill prior to entry of the LFMA, the LFMA does not contain any release of claims between the parties.

49.     However, the LFMA does include the parties' agreement not to pursue claims for contribution, indemnity and reimbursement of past costs incurred or arising from operation of the Landfill or its closure as long as the LFMA is not breached.

50.     In addition, in a section of the LFMA entitled "Tolling," the parties agreed that, upon a breach of the LFMA, the past cost claims could be asserted and the parties would not raise the defenses that any statute of limitations expired during the term of the LFMA, or that any claim is barred by laches or other equitable doctrines due to the failure to pursue that claim during the term of the LFMA.

51.     Pursuant to these provisions, BFI agreed not to prosecute claims for the over $12 million spent prior to 1998 on closure and post-closure care so long as Monroe complied with its commitments under the LFMA.

52.     From the time the LFMA was executed through to the present day, BFI has honored its obligations under the LFMA and has implemented post-closure activities at the Landfill.  As a result of BFI's efforts, when NJDEP and USEPA completed their first five-year inspection of the Landfill in 1998, they concluded that the remedy outlined in the ROD continued to be protective of public health and the environment.

53.     Every five years since that time, and most recently in 2019, NJDEP and USEPA have conducted additional five-year inspections and, each time, the agencies found that BFI's implementation of the remedy and ongoing operation and maintenance activities at the Landfill were appropriate and that the remedy outlined in the ROD continued to be protective of public health and the environment.

**E.     BFI Terminates the LFMA After Monroe Fails to Reimburse BFI or Budget for Lawn and Fence Maintenance Costs.**

54.     Up until 2020, Monroe met its responsibilities under the LFMA and paid for Lawn and Fence Maintenance costs as required by the LFMA.

55.     However, beginning in 2021, Monroe failed to perform its responsibilities under the LFMA in two principal respects.

56.     First, Monroe failed to pay BFI's invoices for Lawn and Fence Maintenance costs incurred in calendar year 2021.

57.     On March 23, 2022, BFI invoiced Monroe for $123,209.40 representing the costs for the Lawn and Fence Maintenance for calendar year 2021.  Per the procedures detailed in the LFMA, BFI requested timely payment of the entire invoice or, alternatively, payment of the amount budgeted by Monroe for 2021 costs along with a commitment to pay the overage on January 1, 2023.

58.     Despite BFI's follow up efforts, Monroe failed to make any payment on account of

Lawn and Fence Maintenance costs for calendar year 2021 and thus failed to perform its responsibilities under the LFMA.

59.    Second, Monroe failed to perform its responsibilities under the LFMA by refusing to budget for the estimated Lawn and Fence Maintenance costs for calendar 2022.

60.    In 2020, Monroe hired an engineering firm, Jacobs Engineering Group Inc. ("Jacobs"), to evaluate conditions at the Landfill and to recommend areas for improvement.

61.    In a report dated November 12, 2020, Jacobs identified multiple measures needed to improve the Landfill's environmental performance.  Those recommend measures included Lawn and Fence Maintenance activities that Monroe was required to budget and pay for under the LFMA.  Jacobs recommended that, after undertaking a survey of the Landfill cover to identify depressions, areas of reverse sloping and rutting, activities should be undertaken to reestablish the grade of the Landfill's cover so that it promotes stormwater runoff.

62.    BFI obtained a contractor's estimate of the cost of implementing the measures recommended by Jacobs.  Consistent with Jacobs' recommendation, BFI engaged a consulting engineer to prepare a grading plan for the Landfill.  The grading plan was then provided to K&A Excavating Co., Inc., which submitted a detailed cost estimate of $857,524.00 for the work; however, K&A advised that it was prepared to perform the work for $800,000.00.

63.    Thereafter, in accordance with the LFMA, BFI provided the Township with a calendar year 2022 budget of $842,425.00 for Lawn and Fence Maintenance costs.  The 2022 budget provided by BFI included $800,000.00 for the Landfill improvements recommended by Monroe's consultant and an additional $42,425.00 for mowing, tree trimming, fence maintenance and security.

64.    Under the terms of the LFMA, Monroe was required to include the $842,425.00 in

12

its 2022 budget.  However, Monroe refused, claiming that it had no responsibility under the LFMA to pay for the activities covered by BFI's budget.

65.     Due to Monroe's breach of the LFMA, BFI terminated the LFMA on January 5, 2023.

66.     Due to Monroe's breach of the LFMA, BFI is now entitled to assert claims for contribution, indemnification, reimbursement or other forms of participation for the more than $12 million in closure and post-closure costs incurred as of the date of the LFMA.  Moreover, pursuant to the LFMA, Monroe cannot raise the defenses that any statute of limitations expired during the term of the LFMA or that BFI's claim is barred by laches or other equitable doctrines.

**F.     BFI Obtains Guaranteed Access to the Municipal Sewers for Leachate Disposal.**

67.     An important element of the closure efforts implemented at the Landfill involved the proper disposal of leachate collected at the Landfill.  In implementing the consent order entered into with NJDEP, and under the oversight and with the approval of NJDEP, leachate from the Landfill has been disposed of through conveyance to Monroe's municipal sewerage system for ultimate treatment by the Middlesex County Utilities Authority ("MCUA") at its NJDEP-permitted sewage treatment plant.  This conveyance was implemented through a sewer connection proximate to the northeast corner of the Landfill and Lani Street.  The sewer connection was originally approved by the MCUA on August 9, 1982 and has been the subject of a series of Non-Domestic Wastewater Discharge Permits issued by the MCUA.

68.     Through the referenced sewer connection, leachate from the Landfill is transmitted along with other sewage through sewers located in the Lani Street residential neighborhood (the "Lani Street Sewers") and flows through Monroe's sewer network and ultimately reaches the MCUA plant.

69.     The conveyance of leachate from the Landfill into the municipal sewer system has

been governed by two agreements between BFI and the Monroe Township Municipal Utilities Authority ("MTMUA"), whose operations and responsibilities have since been assumed by Monroe's Utility Department.

70.     The first of these agreements is entitled Interim Leachate Transmission Agreement and dated August 10, 1982.  Under this agreement, leachate from the Landfill was authorized to be temporarily discharged into the Lani Street Sewers until the MTMUA completed construction of its Manalapan Brook Drainage Area Sewerage Project and until a connection to that newly-constructed system could be completed.

71.     The second agreement is entitled Leachate Transmission Agreement, Monroe Township Landfill Site and dated June 28, 1989.  This agreement rescinded the Interim Leachate Transmission Agreement and expressly authorized BFI to discharge leachate generated at the Landfill into the Lani Street Sewers "**indefinitely**."

72.     Specifically, the Leachate Transmission Agreement dictates that Monroe must allow BFI to "continue to discharge leachate generated at the Monroe Landfill Site into the Lani Street Sewer Line indefinitely."  In return, BFI was responsible, among other things, to provide permanent stand-by power at the Ashmall Avenue Pumping Station.

73.     The introduction of leachate into the Lani Street Sewers commenced in January 1983.

74.     The approved remedial action designated by the ROD in 1993 directed the continued disposal of leachate through the Lani Street Sewers as part of the implementation of the final remedy at the Landfill.

75.     Consistent with the ROD, the Post-Closure Plan relied on the continued use of the Lani Street Sewers for the transmittal of leachate to the MCUA treatment plant.

76.    When entering into the LFMA and allocating responsibilities for implementing and funding the Post-Closure Plan, BFI and Monroe relied on the continued use of the Lani Street Sewers for the transmittal of leachate to the MCUA treatment plant.  The parties did not make and had no reason to make other arrangements for leachate disposal due to BFI's right to use the Lani Street Sewers indefinitely under the Leachate Transmission Agreement.

77.    There is no provision in the Leachate Transmission Agreement allowing Monroe to unilaterally terminate the agreement and release itself from its obligations.

78.    From the time leachate was introduced into the Lani Street Sewers in January 1983 up until September 2020, BFI discharged leachate to the municipal sewer system via the connection to the Lani Street Sewers without issue.

## G.    Monroe Directs BFI to Cease Discharging Leachate Into the Lani Street Sewers and Blocks the Reintroduction of Leachate Even Though Approved by NJDEP.

79.    Although the conveyance of leachate to the municipal sewer system via the connection to the Lani Street Sewers proceeded without incident for 37 years, Monroe directed BFI to cease discharging leachate in September 2020.

80.    Monroe's abrupt action was prompted by its receipt of odor complaints received from residents living in the vicinity of the Lani Street Sewers.

81.    Monroe initially received reports in August 2020 from residents living in the vicinity of the Lani Street Sewers that odors emanating from the sewer system were escaping into their homes and into the neighborhood as a whole.  Similar reports were received again by Monroe in September 2020.

82.    Despite BFI's unambiguous contract right to use the Lani Street Sewers "indefinitely," Monroe directed BFI to cease discharging leachate on September 17, 2020.

83.    BFI complied with Monroe's direction and ceased leachate discharges to the

municipal sewer system via the connection to the Lani Street Sewers on September 17, 2020.

84.     Prior to directing BFI to cease the discharge of leachate to the Lani Street Sewers, Monroe did not undertake any technical evaluation as to why leachate had been discharged to the Lani Street Sewers for 37 years without incident and then could have suddenly contributed to odor issues.  Indeed, the leachate from the Landfill in 2020 was far more dilute than the leachate generated by the Landfill when originally transmitted in earlier periods closer in time to the Landfill's cessation of operations in 1978.

85.     Prior to directing BFI to cease the discharge of leachate to the Lani Street Sewers, Monroe did not undertake any technical evaluation to evaluate whether there was a malfunction in the municipal sewer system or in the residential sewer connections that led to the escape of odors from the Lani Street Sewers.

86.     Prior to directing BFI to cease the discharge of leachate to the Lani Street Sewers, Monroe did not undertake any technical evaluation to determine whether the leachate could be discharged to the Lani Street Sewers in a manner that did not produce the odors detected by residents.

87.     Even though the Lani Street Sewers have not been used for leachate disposal since September 2020, odor complaints from residents have continued subsequent thereto and have been received as recently as December 2022.

88.     Due to Monroe's directive to cease leachate discharges to the Lani Street Sewers, an alternate means of disposing of the leachate collected at the Landfill needed to be developed on an emergency basis.  As a result, BFI established a temporary, emergency program involving the trucking of leachate to distant treatment facilities.

89.     The trucking of leachate to distant treatment facilities required the immediate

development of infrastructure at the Landfill to store large quantities of leachate in aboveground storage tanks so that the leachate could then be loaded onto trucks on a daily basis as needed.

90.    The trucking of leachate to distant treatment facilities also required the identification of alternate treatment facilities capable of accepting leachate from the Landfill and of contractors capable of trucking large quantities of leachate to the alternate treatment facilities on a daily basis.

91.    Although Monroe (as current owner and former operator) and BFI (as a former operator) are jointly and severally responsible for the Landfill, BFI alone took action to ensure that the leachate continued to be properly managed after the abrupt disconnection from the Lani Street Sewers.  To dispose of the leachate by alternative means, BFI has thus far incurred costs in excess of $13 million and is still incurring additional costs on a continuing basis. Monroe expressly refused to contribute toward these costs.

92.    Because the trucking and distant disposal of leachate from the Landfill was never intended to be a long-term solution, BFI undertook to evaluate the causes of the odors experienced in the vicinity of the Lani Street Sewers and to develop a responsible plan for the reintroduction of leachate into the municipal sewer system under the supervision of NJDEP and with input from Monroe.

93.    BFI conducted the required analysis for more than six months.  As part of its efforts, BFI installed sensitive meters in the Lani Street Sewers to assess their capacity to transmit the required volume of leachate.  Studies were undertaken to assess the performance of the Lani Street Sewers, initially when receiving only domestic sewerage from the residences in the neighborhood and later when clean water was introduced into the Lani Street Sewers at various rates of discharge. The testing showed that the Lani Street Sewers were capable of handling that volume of liquids

with no measurable odor impacts.

94.     Based on the test results, BFI submitted a Leachate Reintroduction Plan to NJDEP for the gradual reintroduction of leachate into the Lani Street Sewers.  Under the Leachate Reintroduction Plan, the reintroduction of leachate would occur on a staged basis and, during the course of leachate reintroduction, the Lani Street Sewers would be carefully monitored to ensure that all liquids were being properly conveyed through the system and that no abnormal air pressures were being created within the Lani Street Sewers that might result in the escape of odors.

95.     NJDEP carefully reviewed BFI's Leachate Reintroduction Plan, retaining outside experts to assist in the evaluation and sharing the Plan with Monroe to gain its input.

96.     After concluding its thorough review, NJDEP approved BFI's Leachate Reintroduction Plan on July 19, 2021.

97.     Despite NJDEP's approval, and without any evidence that leachate could not be safely reintroduced into the sewers, Monroe blocked BFI's implementation of the Leachate Reintroduction Plan.

98.     One element of the approved Leachate Reintroduction Plan is the installation and use of monitoring devices in the Lani Street Sewers to ensure that the conveyance of leachate does not create unacceptable pressures in the sewer lines and to allow for the reduction of flows in the event any such circumstance is threatened.  Monroe's own consultant advocated for the installation and use of this monitoring equipment.  Although BFI engaged appropriate technical staff to install and maintain the needed equipment, it required access to the Lani Street Sewers to do so.  BFI's requests for access and its accompanying offer to reimburse Monroe for the cost of its employees in supervising and facilitating that access were rejected despite Monroe having encouraged use of the monitoring devices during the development of the Leachate Reintroduction Plan.

99.     Monroe refused to work with BFI in a constructive fashion to ensure the safe reintroduction of leachate into the Lani Street Sewers and arbitrarily refused to allow the reintroduction of leachate into the Lani Street Sewers under any and all circumstances, in clear and direct contravention of the Leachate Transmission Agreement and regardless of NJDEP's approval.

100.     As Monroe's Mayor stated at a public meeting on August 9, 2022: "When we first started this, there was no way I was going to allow leachate back into a sanitary sewer.  I mean, come on, that should have been done a long time ago.  I couldn't put that back in it. You know, we're still getting pressure to put it back it.  It's still happening.  They're still asking for it.  It's not going to happen."

101.     Monroe's refusal to undertake even the ministerial actions needed for BFI to implement the NJDEP-approved Leachate Reintroduction Plan constitutes a clear violation of the Leachate Transmission Agreement, the LFMA and the covenant of good faith and fair dealing implied in both agreements.  As noted, the Leachate Transmission Agreement entitles BFI to discharge leachate into the Lani Street Sewers "indefinitely[,]"  and the LFMA relied on the continued use of the Lani Street Sewers for the transmittal of leachate from the Landfill.

102.     Given NJDEP's determination that leachate can be safely reintroduced into the Lani Street Sewers, there is and was no sound reason for the continued trucking of leachate from the Landfill, which was implemented as an emergency removal activity, is not consistent with the ROD, has resulted in millions of dollars of additional costs and has unnecessarily burdened nearby residents with truck traffic on their neighborhood streets.

H.     **Monroe's Construction of a Dedicated Force Main for Landfill Leachate**

103.     To date, Monroe refuses to allow reintroduction of leachate into the Lani Street

Sewers.

104.    Instead, Monroe is undertaking the construction of the Force Main which will be capable of transmitting leachate directly from the Landfill to a pre-existing pump station that is part of Monroe's sewer facilities.  The Force Main will be approximately 8,500 feet long and will cost approximately $5 million to construct.

105.    Monroe initially advised BFI that the Force Main would be operational by year end 2021.  Monroe has amended the completion date for the Force Main on multiple occasions and, as of this filing, construction of the Force Main remains incomplete.

106.    BFI sought Monroe's cooperation to reintroduce leachate into the Lani Street Sewers during the pendency of the Force Main's construction, but Monroe adamantly refused. Due to Monroe's refusal, BFI has been required to continue the emergency, temporary trucking of leachate for an extended period and has incurred extremely high and unnecessary costs.

107.    Monroe has publicly stated that it intends to make BFI pay the cost of constructing the Force Main.  Thus far, Monroe has not submitted any formal demand to BFI for payment of the cost of the Force Main nor has it indicated the basis on which it asserts it will be entitled to charge BFI for those costs.

108.    BFI has a contract right to use the Lani Street Sewers.  BFI cannot properly be charged for the cost of the construction of the Force Main when such costs are a direct result from Monroe's breach of BFI's contract right.

109.    Monroe's plan to charge BFI for the cost of constructing the Force Main is contrary to the Leachate Transmission Agreement.  Nothing in the Leachate Transmission Agreement requires BFI to bear the cost of construction of a Force Main for leachate generated at the Landfill. Moreover, the Leachate Transmission Agreement provides that BFI is to be charged for leachate

disposal according to the established published rates for the discharge of sewerage in accordance with Monroe's uniform schedule of rates and fees.

110.    Monroe's plan to charge BFI for the cost of constructing the Force Main is contrary to the provisions of the Municipal and County Sewerage Act governing connection fees and service charges, N.J.S.A. 40A:28A-1 et seq.

111.    Monroe's plan to charge BFI for the cost of constructing the Force Main is contrary to the duly adopted rules and regulations governing the connection fees and service charges imposed by Monroe's Utility Department.

## FIRST CAUSE OF ACTION
### Cost Recovery For Closure and Post-Closure Maintenance Costs Under Section 107(a) of CERCLA

112.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 111 of the Complaint with the same force and effect as if fully set forth herein.

113.    Monroe is a "person" within the meaning of CERCLA.  42 U.S.C. § 9601(21).

114.    The Landfill is a "facility" within the meaning of CERCLA.  42 U.S.C. § 9601(9).

115.    Monroe is and has been the owner of the Landfill at all relevant times and was the operator of the Landfill at a time when hazardous substances were disposed of at the Landfill within the meaning of CERCLA.  42 U.S.C. §§ 9601(14) and (29).

116.    Monroe arranged for the disposal of hazardous substances at the Landfill during the period that BFI operated the Landfill under contract with Monroe.

117.    Releases or threatened releases of hazardous substances into the environment have occurred at the Landfill within the meaning of CERCLA.  42 U.S.C. § 9601(22).

118.    Monroe is a "covered person" under CERCLA.  42 U.S.C. § 9607(a).

119.    CERCLA provides that "any person who at the time of disposal of any hazardous

21

substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable for any "costs of response incurred by any other person" for cleaning up after releases of hazardous materials.  42 U.S.C. § 9607(a)(2), (4)(B).

120.   CERCLA provides that "any person who by contract, agreement or otherwise arranged for the disposal or treatment . . . of hazardous substances owned or possessed by such person" shall be liable for any "costs of response incurred by any other person" for cleaning up after releases of hazardous materials.  42 U.S.C. § 9607(a)(3).

121.   BFI has undertaken response actions at the Landfill in response to releases or threatened releases of hazardous substances consistent with the National Contingency Plan and has incurred response costs for closure and post-closure maintenance of the Landfill in excess of $30 million.

122.   Pursuant to CERCLA, BFI is entitled to recover from Monroe an equitable share of said response costs incurred in connection with the Landfill.  42 U.S.C. §§ 9607(a).

**SECOND CAUSE OF ACTION**

**Cost Recovery For Leachate Trucking and Disposal Costs Under Section 107(a) of CERCLA**

123.   BFI repeats and realleges each and every allegation contained in paragraphs 1 through 122 of the Complaint with the same force and effect as if fully set forth herein.

124.   Monroe is a "person" within the meaning of CERCLA.  42 U.S.C. § 9601(21).

125.   The Landfill is a "facility" within the meaning of CERCLA.  42 U.S.C. § 9601(9).

126.   Monroe is and has been the owner of the Landfill at all relevant times and was the operator of the Landfill at a time when hazardous substances were disposed of at the Landfill within the meaning of CERCLA.  42 U.S.C. §§ 9601(14) and (29).

127.   Monroe arranged for the disposal of hazardous substances at the Landfill during the

period that BFI operated the Landfill under contract with Monroe.

128.    Releases or threatened releases of hazardous substances into the environment have occurred at the Landfill within the meaning of CERCLA.  42 U.S.C. § 9601(22).

129.    Monroe is a "covered person" under CERCLA.  42 U.S.C. § 9607(a).

130.    CERCLA provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable for any "costs of response incurred by any other person" for cleaning up after releases of hazardous materials.  42 U.S.C. § 9607(a)(2), (4)(B).

131.    CERCLA provides that "any person who by contract, agreement or otherwise arranged for the disposal or treatment . . . of hazardous substances owned or possessed by such person" shall be liable for any "costs of response incurred by any other person" for cleaning up after releases of hazardous materials.  42 U.S.C. § 9607(a)(3).

132.    BFI has undertaken response actions at the Landfill in response to releases or threatened releases of hazardous substances consistent with the National Contingency Plan and has incurred response costs for the emergency management of leachate including the construction of extensive infrastructure and implementation of a large-scale tanker truck transportation and office leachate disposal operation in excess of $13 million.

133.    Pursuant to CERCLA, BFI is entitled to recover from Monroe an equitable share of said response costs incurred in connection with the Landfill.  42 U.S.C. §§ 9607(a).

## THIRD CAUSE OF ACTION
## Declaratory Judgment Under Section 113(g)(2) of CERCLA

134.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 133 of the Complaint with the same force and effect as if fully set forth herein.

135.    BFI continues to implement response actions at the Landfill in response to releases

or threatened releases of hazardous substances and will incur additional costs to do so.

136.    Pursuant to CERCLA, 42 U.S.C. § 9613(g)(2), BFI is entitled to entry of a declaratory judgment that Monroe is liable for an equitable share of BFI's future response costs incurred in connection with the Landfill.

**FOURTH CAUSE OF ACTION**
**Contribution Under Section 113(f)(3)(B) of CERCLA**

137.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 136 of the Complaint with the same force and effect as if fully set forth herein.

138.    CERCLA states that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to [the] settlement." 42 U.S.C. § 9613(f)(3)(B).

139.    Through the AOC, BFI resolved its liability to the USEPA for the costs of response actions undertaken by the USEPA with respect to the Landfill.

140.    Pursuant to the AOC, BFI paid USEPA the sum of $100,000.00 representing oversight costs incurred by USEPA under CERCLA in association with the Landfill.

141.    Pursuant to CERCLA, BFI is entitled to contribution from Monroe for the payment made to USEPA under the AOC.  42 U.S.C. § 9613(f)(3)(B).

**FIFTH CAUSE OF ACTION**
**Claims Under the Spill Act**

142.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 142 of the Complaint with the same force and effect as if fully set forth herein.

143.    A provision of the Spill Act, N.J.S.A. 58:10-23.11f(a)(2)(a), states, in pertinent part, that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a

24

hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance."

144.    Monroe is a "person" within the meaning of Spill Act.  N.J.S.A. 58:10-23.11b(o).

145.    "Discharges" of "Hazardous Substances" within the meaning of Spill Act, N.J.S.A. 58:10-23.11b(h) and (k), have occurred at the Landfill.

146.    Monroe is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act.  N.J.S.A. 58:10-23.11f(a)(2).

147.    BFI incurred cleanup and removal costs attributable to discharges of hazardous substances at the Landfill under the supervision and with the written approval of the NJDEP.

148.    Pursuant to the Spill Act, N.J.S.A. 58:10-23.11f(a)(2), BFI is entitled to contribution from Monroe for an equitable share of the cleanup and removal costs it has incurred.

## SIXTH CAUSE OF ACTION
### Contribution Under the Landfill Closure Act and New Jersey Statutes and Common Law

149.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 148 of the Complaint with the same force and effect as if fully set forth herein.

150.    A provision of the Landfill Closure Act, N.J.SA. 13:1E-103, states: "Every owner or operator of a sanitary landfill facility shall be jointly and severally liable for the proper operation and closure of the facility, as required by law, and for any damages, no matter by whom sustained, proximately resulting from the operations or closure."  N.J.S.A. 13:1E-103.

151.    The Landfill Closure Act defines the terms owner and operator to include "in addition to the usual meanings thereof, every owner of record of any interest in land whereon a sanitary landfill facility is or has been located. . . ."  N.J.S.A. 13:1B-102(b).

152.    Monroe, in its capacity as the owner and an operator of the Landfill, is jointly and severally liable under the Landfill Closure Act for the cost of closure of the Landfill and for damages proximately resulting from its closure.

153.    BFI has incurred substantial costs in properly closing the Landfill.

154.    BFI has incurred more than its proportionate share of the costs of the closure of the Landfill and has been damaged thereby.

155.    Monroe has not contributed its proportionate share of the costs of the closure of the Landfill.

156.    Monroe is liable to reimburse BFI for its proportionate share of the costs of closing the Landfill and for the damages incurred by BFI in closing the Landfill.

157.    Pursuant to Landfill Closure Act, New Jersey's statutory provisions for contribution (including N.J.S.A. 2A:53A-1 et seq.) and the common law, BFI is entitled to contribution from Monroe for a proportionate share of costs related to proper closure of the Landfill, and for damages that BFI has sustained due to its payment of more than its proportionate share of the costs of closing the Landfill.

### SEVENTH CAUSE OF ACTION
### Breach of Contract – Lawn and Fence Maintenance Agreement

158.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 157 of the Complaint with the same force and effect as if fully set forth herein.

159.    The LFMA was a valid and enforceable contract.

160.    Pursuant to the terms of the LFMA, BFI agreed to arrange for Lawn and Fence Maintenance at the Landfill, as defined in the LFMA.

161.    Pursuant to the LFMA, Monroe agreed to pay BFI for the cost of the Lawn and Fence Maintenance, as defined in the LFMA.

26

162.    Pursuant to the LFMA, Monroe agreed to include in its municipal budget for each year the amount estimated by BFI to be incurred in that year in the performance of Lawn and Fence Maintenance.

163.    BFI performed its obligations under the LFMA.

164.    Monroe failed to pay BFI's invoice for $123,209.40 for the Lawn and Fence Maintenance costs incurred by BFI in calendar year 2021.

165.    Monroe failed to budget for estimated Lawn and Fence Maintenance costs for 2022 as required by the LFMA.

166.    Monroe's failure to pay BFI's invoice for 2021 costs and failure to include BFI's estimate of 2022 costs in its municipal budget constitute breaches of the LFMA.

167.    As a result of Monroe's aforestated breaches of the LFMA, BFI terminated the LFMA on January 5, 2023.

168.    BFI has been harmed by Monroe's breaches as described herein.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing – Lawn and Fence Maintenance Agreement

169.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 168 of the Complaint with the same force and effect as if fully set forth herein.

170.    The LFMA was a valid and enforceable contract.

171.    Implied within the LFMA was a covenant of good faith and fair dealing.

172.    When entering into the LFMA and allocating responsibilities for implementing and funding the Post-Closure Plan, BFI and Monroe relied on the continued use of the Lani Street Sewers for the transmittal of leachate to the MCUA treatment plant.

173.    When entering into the LFMA, BFI possessed the reasonable expectation that

Monroe would not undertake actions in bad faith to block the transmittal of leachate through the use of the Lani Street Sewers.

174.     Monroe acted in bad faith to intentionally block the transmittal of leachate through the use of the Lani Street Sewers and thereby breached the implied covenant of good faith and fair dealing in the LFMA.

175.     BFI has been harmed by Monroe's breach of the implied covenant of good faith and fair dealing in the LFMA.

## NINTH CAUSE OF ACTION
### Breach of Contract – Leachate Transmission Agreement

176.     BFI repeats and realleges each and every allegation contained in paragraphs 1 through 175 of the Complaint with the same force and effect as if fully set forth herein.

177.     The Leachate Transmission Agreement is a valid and enforceable contract.

178.     Pursuant to the Leachate Transmission Agreement, BFI gained the right to use of the Lani Street Sewers for leachate disposal from the Landfill "indefinitely."

179.     BFI has performed its obligations under the Leachate Transmission Agreement.

180.     In September 2020, Monroe directed BFI to cease discharging leachate into the Lani Street Sewers.

181.     On July 19, 2021, NJDEP approved the Leachate Reintroduction Plan submitted by BFI, finding that continued use of the Lani Street Sewers was safe for disposal of leachate from the Landfill under the terms of the Plan.

182.     Subsequent to NJDEP's approval of the Leachate Reintroduction Plan, Monroe continued to block the use of the Lani Street Sewers for leachate disposal from the Landfill.

183.     By failing to provide BFI with access to the Lani Street Sewers for leachate disposal at all times since September 2020, and by refusing to permit reintroduction of leachate into the

28

Lani Street Sewers following NJDEP's approval of BFI's Leachate Reintroduction Plan on July 19, 2021, Monroe breached the Leachate Transmission Agreement.

184.    During the time that BFI has not been allowed to use the Lani Street Sewers, BFI has incurred substantial costs related to construction of leachate storage infrastructure and the trucking and disposal of leachate that it would not have incurred but for Monroe's breach of the Leachate Transmission Agreement.

185.    BFI has been harmed by Monroe's breaches as described herein.

## TENTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing – Leachate Transmission Agreement

186.    BFI repeats and realleges each and every allegation contained in paragraphs 1 through 185 of the Complaint with the same force and effect as if fully set forth herein.

187.    The Leachate Transmission Agreement is a valid and enforceable contract.

188.    Implied within the Leachate Transmission Agreement is a covenant of good faith and fair dealing.

189.    Pursuant to the Leachate Transmission Agreement, BFI gained the right to use of the Lani Street Sewers for leachate disposal from the Landfill "indefinitely."

190.    When entering into the Leachate Transmission Agreement, BFI possessed the reasonable expectation that Monroe would not undertake actions in bad faith to block the transmittal of leachate through the use of the Lani Street Sewers.

191.    In September 2020, Monroe directed BFI to cease discharging leachate into the Lani Street Sewers.

192.    On July 19, 2021, NJDEP approved the Leachate Reintroduction Plan submitted by BFI, finding that continued use of the Lani Street Sewers was safe for disposal of leachate from

the Landfill under the terms of the Plan.

193.     Subsequent to NJDEP's approval of the Leachate Reintroduction Plan, Monroe continued to block the use of the Lani Street Sewers for leachate disposal from the Landfill.

194.     Monroe acted in bad faith by intentionally terminating BFI's access to the Lani Street Sewers for leachate disposal at all times since September 2020 and by refusing to permit reintroduction of leachate into the Lani Street Sewers following NJDEP's approval of BFI's Leachate Reintroduction Plan on July 19, 2021. Monroe thus breached the implied covenant of good faith and fair dealing in the Leachate Transmission Agreement.

195.     During the time that BFI has not been allowed to use the Lani Street Sewers, BFI has incurred substantial costs related to construction of leachate storage infrastructure and the trucking and disposal of leachate that it would not have incurred but for Monroe's breach of the implied covenant of good faith and fair dealing in the Leachate Transmission Agreement.

196.     BFI has been harmed by Monroe's breach of the implied covenant of good faith and fair dealing as described herein.

## ELEVENTH CAUSE OF ACTION
### Declaratory Judgment – Force Main Costs

197.     BFI repeats and realleges each and every allegation contained in paragraphs 1 through 196 of the Complaint with the same force and effect as if fully set forth herein.

198.     In breach of the Leachate Transmission Agreement, Monroe has blocked BFI from using the Lani Street Sewers for the disposal of leachate.

199.     Instead of allowing BFI to use the Lani Street Sewers for leachate disposal, Monroe is instead building a Force Main for leachate generated from the Landfill.

200.     Monroe has publicly stated that it will make BFI pay the cost of constructing the Force Main.

201.     There is no legal basis for Monroe to charge BFI for the cost of constructing the Force Main.

202.     Monroe is obligated to comply with the Leachate Transmission Agreement which allows BFI to use the Lani Street Sewers indefinitely for the disposal of leachate and establishes the financial terms governing that use.

203.     To the extent that Monroe is unable or unwilling to meet its obligations under the Leachate Transmission Agreement, Monroe—not BFI—must pay the cost of an alternate means of leachate disposal.

204.     BFI is entitled through the Leachate Transmission Agreement to use the Force Main for leachate disposal at the same cost to BFI as if it were using the Lani Street Sewers for leachate disposal.

205.     Monroe is solely responsible for the costs associated with the construction of the Force Main.

206.     BFI seeks declaratory relief that Monroe is solely liable for costs related to construction of the Force Main.

207.     BFI also seeks declaratory relief that the financial terms of the Leachate Transmission Agreement will govern BFI's discharges of leachate to the municipal sewers through the Force Main.

## TWELFTH CAUSE OF ACTION
## Declaratory Judgment – Municipal and County Sewerage Act and Monroe's Implementing Regulations

208.     BFI repeats and realleges each and every allegation contained in paragraphs 1 through 207 of the Complaint with the same force and effect as if fully set forth herein.

209.     Monroe has stated that it intends to make BFI pay the cost of constructing the Force

Main.

210.     Monroe's ability to impose charges for sewer services is governed by the Municipal and County Sewerage Act, which authorizes the imposition of service charges and connection fees. N.J.S.A. 40A:26A–10 and –11.

211.     Under the Municipal and County Sewerage Act, service charges must be uniform and equitable for the same types and classes of use in service of the sewer facilities subject to exceptions not relevant here.

212.     Under the Municipal and County Sewerage Act, connection fees must be uniform within each class of the users.

213.     Monroe has established by ordinance a rate schedule specifying the fees and charges for sewer service provided by Monroe.

214.     Under Monroe's rate schedule for sewer service, the customer shall be the owner of the property which is responsible for the payment of bills issued by Monroe.

215.     Under Monroe's rate schedule for sewer service, the owner is defined as the party whose property a building or structure is located upon.  According to the rate schedule, in the event that one entity owns the building while another owns the property, the owner responsible for payment is the property owner.

216.     Under the Municipal and County Sewerage Act as implemented by Monroe's rate schedule for sewer service, Monroe cannot charge BFI for the cost of constructing the Force Main because BFI is not the owner of the Landfill.

217.     Under the Municipal and County Sewerage Act as implemented by Monroe's rate schedule for sewer service, Monroe cannot charge BFI for the cost of constructing the Force Main because Monroe's charges must be uniform within each class of users.

218.    Under the Municipal and County Sewerage Act as implemented by Monroe's rate schedule for sewer service, Monroe cannot charge BFI for the cost of constructing the Force Main because such charges would be contrary to the rate schedule for sewer service promulgated by Monroe.

219.    Under the Municipal and County Sewerage Act as implemented by Monroe's rate schedule for sewer service, Monroe cannot charge BFI for the cost of constructing the Force Main because the Landfill has been connected to Monroe's sewer system since 1983 and because there is no legal authority to charge a second connection fee upon an expansion or alteration of the municipal sewer system.

220.    Accordingly, BFI seeks declaratory relief that Monroe lacks the legal authority to charge BFI for the cost of constructing the Force Main.

**WHEREFORE**, BFI demands judgment against Monroe as follows:

A.    Enter a judgment in favor of BFI against Monroe for an equitable share of BFI's response costs for closure and post-closure maintenance of the Landfill pursuant to 42 U.S.C. § 9607(a)(4)(B) and issue an Order requiring Monroe to pay such amount to BFI; and

B.    Enter a judgment in favor of BFI against Monroe for an equitable share of BFI's response costs for the emergency management of leachate incurred at or with respect to the Landfill since September 2020 pursuant to 42 U.S.C. § 9607(a)(4)(B) and issue an Order requiring Monroe to pay such amount to BFI; and

C.    Enter a declaratory judgment in favor of BFI against Monroe pursuant to 42 U.S.C. § 9613(g)(2), declaring, adjudging, and decreeing that Monroe is liable to BFI for an equitable share of BFI's future response costs incurred at or with respect to the Landfill, such judgment to be binding in any subsequent action or actions to recover further response costs; and

D.      Enter a judgment in favor of BFI against Monroe pursuant to 42 U.S.C. § 9613(f) for contribution as to BFI's payment made to USEPA under the AOC and issue an Order requiring Monroe to pay said contribution to BFI; and

E.      Enter a judgment in favor of BFI against Monroe for an equitable share of BFI's cleanup and removal costs incurred at or with respect to the Landfill pursuant to N.J.S.A. 58:10-23.11f(a)(2) and issue an Order requiring Monroe to pay such amount to BFI; and

F.      Enter a declaratory judgment in favor of BFI against Monroe declaring, adjudging and decreeing that Monroe is liable for an equitable share of BFI's future cleanup and removal costs incurred at or with respect to the Landfill pursuant to N.J.S.A. 58:10-23.11f(a)(2), such judgment to be binding in any subsequent action or actions to recover future cleanup and removal costs; and

G.      Enter a judgment in favor of BFI against Monroe for contribution as to the costs BFI has incurred to close and maintain the closure of the Landfill and for damages proximately resulting therefrom under the Landfill Closure Act and New Jersey statutory and common law; and

H.      Enter a declaratory judgment in favor of BFI against Monroe declaring, adjudging, and decreeing that Monroe is liable for an equitable share of BFI's future costs to close and maintain the closure of the Landfill proximately resulting therefrom under the Landfill Closure Act and New Jersey statutory and common law, such judgment to be binding in any subsequent action or actions to recover costs to close and maintain the closure of the Landfill; and

I.      Enter a judgment in favor of BFI against Monroe for damages stemming from Monroe's breach of the LFMA and the covenant of good faith and fair dealing implied therein; and

J.    Enter a judgment in favor of BFI against Monroe for damages stemming from Monroe's breach of the Leachate Transmission Agreement and the covenant of good faith and fair dealing implied therein; and

K.    Enter a declaratory judgment in favor of BFI against Monroe declaring, adjudging, and decreeing that Monroe must adhere to the financial terms of the Leachate Transmission Agreement going forward; and

L.    Enter a declaratory judgment in favor of BFI against Monroe declaring, adjudging, and decreeing that Monroe is without legal authority to charge, assess or otherwise impose the cost of construction of the Force Main on BFI; and

M.    Enter an injunction in favor of BFI against Monroe enjoining Monroe from charging, assessing or otherwise imposing the cost of construction of the Force Main on BFI; and

N.    Any further and additional relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, BFI demands trial by jury in this action for all issues so triable.

Dated: January 6, 2023                     Respectfully submitted,

/s/ Ross A. Lewin
Ross A. Lewin
P. Leigh Bausinger
Antoinette M. Snodgrass
FAEGRE DRINKER BIDDLE & REATH LLP
105 College Road East, P.O. Box 627
Princeton, New Jersey 08542
Telephone:  (609) 716-6500
Fax:  (609) 799-7000
Email: ross.lewin@faegredrinker.com
Email: leigh.bausinger@faegredrinker.com
Email: antoinette.snodgrass@faegredrinker.com
*Attorneys for Plaintiff*
*BFI Waste Systems of New Jersey, Inc.*

35